**MILLIKEN & COMPANY, Plaintiff,**

v.

**MOHAWK INDUSTRIES, INC., Mohawk Carpet Corporation, Aladdin Manufacturing Corporation, and Mohawk Commercial, Inc., Defendants.**

No. C.A. 7:02–3631–20.

United States District Court, D. South Carolina, Spartanburg Division.

Sept. 15, 2004.

Lemuel Gray Geddie, Jr., Phillip Arthur Kilgore, Ogletree, Deakins, Nash, Smoak and Stewart Eric C. Woglom, Daniel S.

Hulme, Michael P. Kahn, Stephen T. Straub, Matthew A. Traupman, Daniel M. Gantt, Kenneth A. Genoni, Fish and Neave, Greenville, SC for Plaintiff.

William Alexander Coates, Roe, Cassidy, Coates, and Price, Frank G. Smith, John D. Haynes, Robin McGrath, Greenville, SC, for Defendants.

## MEMORANDUM OF DECISION

HERLONG, District Judge.

This matter is before the court on Mohawk Industries, Inc., Mohawk Carpet Corporation, Aladdin Manufacturing Corporation, and Mohawk Commercial, Inc.'s (collectively "Mohawk") counterclaim of inequitable conduct alleging that the Patents–In–Suit, U.S. 6,203,881 ("'881 patent") and U.S. 6,468,623 ("'623 patent"), are unenforceable because Milliken & Company ("Milliken") engaged in inequitable conduct before the United States Patent and Trademark Office ("PTO"). Milliken brought a patent infringement suit against Mohawk alleging that Mohawk infringed certain claims in the Patents–in–Suit. A jury trial was held from May 4, 2004 through May 24, 2004. The jury returned a verdict finding both Patents–In–Suit invalid. On July 26, 2004, a bench trial was held to resolve Mohawk's counterclaim of inequitable conduct.

After consideration of all of the relevant evidence of record and the arguments of the parties, the court now declares its findings of fact and conclusions of law. Should a finding of fact constitute a conclusion of law, or vice versa, the court adopts it as such and directs that it be treated accordingly.

### I. FINDINGS OF FACT

1. Milliken is the owner of the Patents–in–Suit.

2. Ken Higgins ("Higgins"), a Milliken engineer with considerable experience in the carpet industry, is the named inventor on the '881 and '623 patents.

3. The Patents–In–Suit generally concern a cushion carpet tile comprised of (from bottom to top) a backing material, a foam cushion layer, a stabilizing layer, an adhesive layer, and a primary carpet fabric. The inventive concept is the single stabilizing layer between the adhesive layer and the foam cushion layer, which is in contact with the adhesive and partially embedded in the foam cushion.

4. Mohawk alleges that Milliken engaged in inequitable conduct because (1) Higgins and James Robertson ("Robertson"), a patent attorney substantially involved in the prosecution of the Parent Application, U.S. Patent Application No. 08/205,834 for the Patents–In–Suit, failed to disclose Textile Rubber & Chemical Company's ("TRC") prior art to the PTO, and (2) Higgins made intentional misrepresentations in Claim 1 of the Parent Application for the Patents–In–Suit when he falsely declared that he was "the original, first, and sole inventor" of the claimed invention in the Declaration of Patent Application. Specifically, Mohawk alleges that TRC was the first to invent the single stabilizing layer carpet tile and that Higgins and Robertson learned of TRC's single stabilizing layer carpet tile structure and engaged in inequitable conduct by not disclosing TRC's prior art to the PTO. Further, Mohawk alleges that Higgins falsely declared that he was the first inventor of the claimed inventions in the Parent Application that ultimately led to the Patents–In–Suit because initially Claim 1 of the Parent Application was directed to carpet and not limited to carpet tile. Higgins admits that he did not invent Claim 1 as originally drafted, but that the failure to limit the claims to carpet tile was an innocent mistake. In order to evaluate Mohawk's claim of inequitable conduct, it

is necessary to discuss Milliken's history of carpet tile development, TRC's history of carpet tile development, Milliken's contacts with TRC, Robertson's knowledge of TRC's prior art, and Milliken's representations to the PTO during the prosecution of the Patents–In–Suit.

### A. History of Milliken's Carpet Tile Development

5. In the 1980's and 1990's, Higgins' primary focus was on the development of cushion back carpet tile.

6. In the 1984 to 1985 time frame, Milliken and Dow Chemical Company ("Dow"), a supplier of chemicals to the carpet industry, including the raw chemicals used to formulate polyurethane, began working together on ways to produce carpet tiles. Dow worked with Milliken to test cushion back carpet tile structures and to develop a range on which carpet tile could be manufactured.

7. Randall Jenkines ("Jenkines") of Dow assisted Higgins with the testing and development of cushion back carpet tile structures.

8. In addition, Jim Jennings ("Jennings") of Dow worked with Higgins in connection with the testing and development of cushion back carpet tile structures and the design of a range on which such structures could be manufactured.

9. Initially, Milliken developed a carpet tile with two stabilizing layers known as the "Comfort Plus" product which was manufactured in two steps. Custom Coating, Inc. ("Custom Coating") manufactured a polyurethane foam cushion pad comprised of (from top to bottom), a felt or polypropylene backing layer, a polyurethane foam layer, and a secondary backing layer made of woven polypropylene that was sold to Milliken. The foam cushion pad was then laminated to its carpet face using hot-melt adhesive. Because the cushion pad lacked internal stability, Milliken inserted a layer of open mesh fiberglass into the hot melt adhesive during the lamination process. Therefore, there was a stabilizing layer in the cushion pad and an additional stabilizing layer inserted by Milliken prior to lamination to provide stability to the carpet tile.

10. The Comfort Plus product with two stabilizing layers is embodied in Higgins' U.S.Patent No. 4,522,857 ("the '857 patent"), which issued in June 1985.

11. However, Milliken experienced problems with the consistency of the thickness of the cushion pad purchased from Custom Coating and wanted to lower the cost of the cushion pads.

12. Consequently, Milliken began to research alternatives to Custom Coating's cushion pads including the possibility of bringing the technology in-house or engaging another company to manufacture the pads.

13. Vince Foody ("Foody"), a Milliken development engineer who reported directly to Higgins, and Higgins, along with others at Milliken, were involved in investigating alternative sources of the cushion pads, including locating possible alternate suppliers or the possibility of bringing the manufacturing of the cushion pad in-house.

14. In addition, Higgins, with the assistance of Dow, continued to test different carpet tile structures in an effort to develop new carpet tile structures.

15. In 1992 and 1993, Milliken and Dow conducted a number of trials on various cushion back carpet tile structures using Dow's small testing polyurethane range.

16. Further, trials were conducted at TRC because it had the only full size range on which to test carpet tile structures.

17. In the fall of 1993, after research and experimentation, Higgins believed that he invented the cushion back carpet tiles

with a single stabilizing layer claimed in the Patents–In–Suit.

### B. TRC's History in Carpet Tile Development

18. TRC supplies polyurethane chemicals to carpet companies such as Milliken and Mohawk for use in the manufacture of carpet backings.

19. At some point between 1989 and 1991, TRC developed a cushion back carpet structure with a single stabilizing layer for six-foot wide products. The structure was (from top to bottom): (1) a carpet fabric of yarn tufted through a primary backing (with or without a secondary backing attached); (2) polyurethane adhesive; (3) a non-woven fiberglass mat partially embedded in a(4) mechanically-frothed, 18–lb. density polyurethane foam; and (5) a textile backing.

20. TRC manufactured this product in a continuous process on a belted range. TRC was the first to develop this technology.

21. Various witnesses have provided conflicting dates as to when TRC developed its single stabilizing layer cushion carpet structure. Larry Mashburn testified at trial that he developed TRC's single stabilizing layer cushion back carpet tile in 1989 or 1990 and that he conceived of the concept possibly as early as 1987. Other TRC employees testified at trial that TRC developed the final carpet tile structure in 1990 or 1991. (Notably, both Milliken and TRC lost records due to separate fires at their respective facilities prior to the commencement of this lawsuit.)

22. A TRC document dated 1991 discusses TRC's "new technology" in cushion composite design for carpet tiles. This date is consistent with the trial testimony of TRC's William Wiegand ("Wiegand"), a TRC sales representative in the late 1980's and early 1990's who was responsible for marketing TRC's cushion back carpet tile design. Wiegand testified that TRC developed the technology for the completed single stabilizing layer cushion back carpet tile in February or March of 1991.

23. TRC also manufactured separately the cushion pad used in its single stabilizing layer carpet tile structure. Unlike the cushion pad Milliken purchased from Custom Coating, TRC's cushion pad had only a single stabilizing layer that was partially embedded in the foam, and could be directly laminated to a carpet without adding another stabilizing layer between the cushion pad and the carpet.

24. TRC offered customers several different options regarding the use of its technology. First, TRC could provide customers with raw chemicals customers could use to develop their own products. Second, TRC could manufacture polyurethane cushion pads in-house for sale. Third, TRC could coat a customer's carpet in its facilities. Fourth, TRC offered for sale the entire system, including the chemicals, the range, product structure, and information about how to make the end product, to allow customers to make the products in-house.

25. TRC was protective of its technology and required a confidentiality agreement before providing information concerning its proprietary technology. TRC did not obtain patent protection for its single stabilizing layer carpet tile technology.

26. TRC has a license agreement with Mohawk that allows Mohawk to use TRC's single stabilizing layer carpet tile technology.

### C. Milliken's Contacts with TRC

27. Milliken investigated whether the equipment TRC used to manufacture products could be used to supply Milliken with

a cushion pad for the Comfort Plus product with two stabilizing layers.

28. Wiegand testified at trial that he informed Milliken of TRC's cushion carpet tile structure and provided samples to Higgins, Foody, E.P. "Rusty" Willimon ("Dr.Willimon"), the General Manager of Milliken's contract carpet group in the late 1980's and early 1990's, and Dennis Riddle ("Riddle") prior to 1993. Specifically, Wiegand testified that in February 1989 he showed Dr. Willimon and Riddle samples of cushion back carpet tiles.

29. Higgins testified that he never received samples of carpet tile from TRC.

30. Foody's contacts with TRC were related to evaluating TRC as a potential supplier of the cushion pad for the Comfort Plus product and evaluating whether TRC's equipment could be used by Milliken to manufacture the cushion pad in-house. In October 1990, Foody requested that TRC send Milliken samples of cushion pad made in accordance with Milliken's specifications. Foody informed Raiford McDonald of TRC that the cushion pads were to be evaluated for thickness or gauge consistency.

31. In October 1990, TRC sent three partial range drawings to Foody. The drawings do not show how to make any specific cushion carpet tile product.

32. In January 1991, TRC provided Foody with a budget estimate for a urethane range that could produce a cushion pad. Foody requested this budget estimate as part of his investigation into whether Milliken could manufacture a cushion pad for the Comfort Plus product in-house.

33. In February 1992, Foody was sent samples of a cushion pad, also referred to as a "cushion composite," similar to the ones requested in 1990. Foody does not recall receiving any samples.

34. Higgins testified he was not aware that Foody contacted TRC and did not recall asking Foody to obtain samples from TRC.

35. Higgins does not recall any discussions between himself and Foody about a budget quotation for a range from TRC. TRC's budget quotation was an estimate which listed the equipment that could be used to create a range and how much it would cost.

36. The list of equipment TRC sent to Foody could be used to make a number of different types of hard back or cushion back carpet products.

37. Foody testified at his deposition that his discussions with Higgins regarding TRC were limited to the potential use of TRC as a second source for cushion pads in addition to Custom Coating.

38. In 1990, Higgins visited TRC's manufacturing floor at TRC's Resaca plant and looked at a range that might be capable of producing cushion pad of more uniform thickness for the Comfort Plus product. Higgins saw the range, which was not in operation, from a distance. He also walked on a tennis court he was told was made on TRC's urethane range. Dow's Jennings testified that the Milliken employees were not allowed to walk up to the range, that they had to stand around thirty feet away, and that none of the Milliken employees had a camera. Raiford McDonald testified at his deposition that he discussed the construction of TRC's tennis court material with the Milliken employees. The tennis court material had the same structure as the Patents–In–Suit except that the top layer was an athletic surface material as opposed to carpet.

39. Higgins testified that he did not see the tennis court composite being manufactured, was not told how it was manufactured, and was not told anything about

the structure of the tennis court composite.

40. In approximately 1995, after the Parent Application was filed, Higgins visited TRC's manufacturing floor a second time. Higgins visited TRC's Dalton plant and observed Milliken's broadloom carpet being coated. Higgins testified at his deposition that he never saw anything related to carpet tile when he was at TRC.

41. Some internal TRC documents reflect additional TRC contacts with Milliken. A document dated March 10, 1987, identifies Riddle, Scott Dempsey ("Dempsey"), and Higgins and mentions TRC's range and composite tolerances. A document dated June 8, 1987, from McDonald, identifies Riddle, Dempsey, and Higgins and concerns Milliken's requirement that TRC's equipment provide a product with a consistent gauge and references Milliken's potential interest in purchasing a range. In four Account Status documents dated November 21, 1989, February 12, 1990, June 15, 1990, and September 26, 1990, it was noted that Dr. Willimon was interested in TRC's process. The June 1990 document notes that Dr. Willimon requested samples of the "six foot roll" products. However, this document does not indicate whether the samples were ever sent. The documents further indicate that Dr. Willimon was unwilling to sign a secrecy agreement and that TRC would not allow him to review its process until a secrecy agreement was signed. It is unclear whether Dr. Willimon ever signed a secrecy agreement. Another TRC document indicates Dr. Willimon requested a meeting with TRC and wanted to include Higgins in the meeting.

42. Milliken conducted trials involving its own carpet tile designs at TRC because TRC was the only company with a full-scale range.

43. There was testimony and evidence of other Milliken contacts with TRC. However, after considering Milliken's contacts with TRC in their totality, these contacts do not show by clear and convincing evidence that Higgins learned of TRC's prior art or that he had the intent to deceive the PTO.

### D. Dow's Contacts with TRC

44. Dow also had contacts with TRC. However, Jennings did not tell Milliken what he had observed at TRC because he had a secrecy agreement with TRC and knew Milliken wanted to develop its own technology. In addition, Jenkines never told Milliken about any processes he saw when he visited TRC.

45. Jennings and Jenkines testified that TRC was very secretive. In addition, Jenkines and Jennings were told to work specifically for Milliken and to avoid other carpet tile manufacturers. After 1988, Jenkines' only contact with TRC included visits to the lobby of a plant.

### E. Robertson's Knowledge regarding TRC Prior Art

46. Robertson was a Milliken patent attorney who was substantially involved in the prosecution of the Parent Application for the Patents–In–Suit. Robertson's notes show that in April 1993 prior to filing the Parent Application, Higgins met with Robertson to discuss the patentability of various concepts relating to carpet tile.

47. The April 1993 meeting occurred several months prior to Higgins' conception of the inventions claimed in the '881 and '623 patents in the fall of 1993.

48. Robertson's notes from this meeting indicate that Higgins was going to request that Dow "conduct a check on the state of the technology patented by [TRC] and other carpet producers." (Def.'s Trial Ex. 3 at 152419.) It is unclear whether Dow ever performed this check.

49. Robertson and Higgins do not remember what transpired at the April 1993 meeting. However, Robertson testified at his deposition that it was his usual practice to inform inventors of their duty to disclose material information to the PTO, that one should err on the side of providing information a PTO Examiner would think important, but that cumulative information need not be disclosed.

50. Robertson's notes from the April 1993 meeting state, in part, that "at present, Textile and Rubber Company [TRC] is thought to be the only organization that may be practicing similar art." The notes also described Higgins' concept as laying "both bonded and tufted" carpet into "urethane" foam. (Def.'s Trial Ex. 3 at M 0152419). Higgins testified at his deposition that he interprets the term "similar art" to mean "that they're forming carpet using urethane foam" and that the phrase "similar art" "just refers to the fact that they [TRC] cast urethane foam on carpet." (Higgins 12/5/03 Dep. Tr. at 18:1–3 and 31:11–19). It was well-known prior art that TRC was casting urethane foam onto carpet.

51. Robertson did not conduct any research regarding the status of TRC's unpatented technology. However, Robertson did request a prior art search in the PTO. On November 9, 1993, Robertson sent a letter to Donald Huff ("Huff"), an independent patent attorney, describing Higgins' invention, providing a drawing of a proposed range, and asking Huff to "conduct a pre-examination search to identify the potential for patentability of both the process and the product formed thereby" and to "verify[ ] the search with an Examiner." (Pl.'s Trial Ex. 1046 at M 0152417).

52. Considering all of Robertson's actions, there is no clear and convincing evidence that Robertson had the intent to deceive the PTO by not investigating TRC's unpatented technology. Further,

Robertson's April 1993 notes do not demonstrate an intent by Higgins or Robertson to deceive the PTO.

## F. Representations to the PTO in the prosecution of the Patents–In–Suit

53. The Patents–In–Suit issued from a series of patent applications that trace back to an original patent application (the "Parent Application"), U.S. Patent Application No. 08/205,834 filed on March 4, 1994.

54. Higgins submitted a Declaration for Patent Application (the "Higgins Declaration") as part of the Parent Application. (Def.'s Ex. 743 at M 212404.)

55. In the Higgins Declaration, Higgins swore that he was "the original, first and sole inventor of the subject matter which is claimed" in that application, including Claim 1; swore that he had "reviewed and under[stood] the contents of the above identified specification, including the claims"; and "acknowledge[d] the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, § 1.56(a)." (*Id.*)

56. Higgins also swore that these statements "were made with the knowledge that willful false statements and the like so made [were] punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon." (*Id.*)

57. The PTO examiner assigned to the Parent Application found that the product, process, and apparatus claims comprised three separate inventions. Therefore, each of the three inventions had to be prosecuted in separate applications, only one of which could continue with the Par-

ent Application; the other two would be prosecuted in divisional applications.

58. The original claims Milliken prosecuted in the Parent Application were related to the process claims for manufacturing polyurethane cushion backing. Some of these claims eventually issued as U.S. Patent No. 5,545,276, which is not contested in this lawsuit.

59. Claim 1 of the Parent Application claimed:

[a] carpet comprising: a primary carpet fabric having a plurality of pile forming yarns projecting outwardly therefrom, and a mass of polyurethane cushioning formed from a polyurethane-forming composition, dispersed on the underside of said primary carpet fabric away from said plurality of pile-forming yarns, said primary carpet fabric being laid in-situ in to [sic] said polyurethane-forming composition without heat forced pre-curing of said polyurethane foam composition. (Def's Ex. 743 at M 0212394.)

60. Claim 14 of the Parent Application claimed:

A process for in-situ formation of a cushion back carpet composite, comprising the steps of:

(a) applying a polyurethane-forming composition to a support surface; and

(b) laying a primary carpet fabric into the polyurethane-forming composition prior to curing the polyurethane-forming composition. (Pl's Trial Ex. 8 at 33–34; Pl's Trial Ex. 18 at M 0212396–97).

61. Claims 1 and 14 of the Parent Application as filed were generally directed to laying carpet fabric in uncured polyurethane foam. However, neither of those claims ever issued in a patent. Robertson believed the original claims were patentable.

62. The claims directed to the carpet products at issue in this litigation, includ-

ing original Claim 1, were included in U.S. Patent Application No. 08/468,707 ("'707 Application"), which was filed on June 6, 1995. The '707 Application was a division of the Parent Application.

63. During prosecution of the '707 Application, the PTO examiner rejected Milliken's product claims, including Claim 1, based on a number of prior art patents.

64. After the examiner rejected Claim 1, Milliken amended the claims of the '707 Application to limit them to "carpet tile," as opposed to "carpet."

65. Following Milliken's amendment, the PTO examiner again rejected the claims and Milliken filed a continuation application to continue prosecution of its carpet tile product claims.

66. Application No. 08/743,376 (the '376 Application) was filed on November 4, 1996, and eventually issued as the '881 Patent.

67. On February 8, 2000, Higgins filed U.S. Patent Application No. 09/499,830 (a continuation of the '376 Application), which eventually issued as the '623 Patent. This application also included Claim 1 of the Parent Application, but the claim was cancelled prior to examination.

68. The applications that issued as the '881 and '623 Patents have the same written description of the invention as the Parent Application because they derived from the Parent Application.

69. The Higgins Declaration applied to the claims that led to the issuance of the Patents–In–Suit.

70. Pursuant to Robertson's request for a prior art search, several patents were uncovered relating to similar carpet structures that were disclosed to the PTO in the application. In particular, the specification for the Parent Application identified

three patents that had been issued to Til-lotson of TRC.

71. Two of those patents, U.S. patent 4,132,817 and U.S. patent 4,171,395, both to Tillotson, show carpet being laid into polyurethane foam. Both of these patents were cited in the specifications of the '881 and '623 patents, and both were before the PTO.

72. Approximately three months after the filing of the Parent Application, Robertson submitted an "Information Disclosure Statement" in which he identified several prior art patents, including four patents to Tillotson of TRC. Robertson provided copies of the patents to the PTO.

73. The Tillotson/TRC patent, U.S. Patent No. 4,171,395, which was disclosed to the PTO, can be read to disclose the subject matter of Claims 1 and 14 of the Parent Application. 74. Higgins admits that the term carpet includes both carpet tile and standard broadloom carpet. At the time Higgins' patent applications were pending, Higgins believed that the description of the TRC patents in the specifications of his applications accurately reflected the state of TRC's carpet technology.

75. When asked about Claim 1, Higgins testified at his deposition that he did not believe that he had "invented laying broadloom carpet into wet polyurethane foam" at the time his original application was filed. (Higgins 12/5/03 Dep. Tr. at 35:7–15). Higgins mistakenly believed that the claims were limited to carpet tile.

76. There is no clear and convincing evidence that Higgins or Robertson had the intent to deceive the PTO by not initially limiting the claims in the patent applications to "carpet tile" as opposed to carpet.

## II. Conclusions of Law

 77. A patent applicant has a duty to prosecute applications before the PTO with candor, good faith, and honesty. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995). "A breach of this duty constitutes inequitable conduct." *Id.* The duty to disclose "information known to be material to patentability" applies to the inventor, the attorney preparing or prosecuting the patent, and "every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c) & (e). The applicant has no duty to conduct a prior art search or disclose prior art of which he is not aware. *See Nordberg, Inc. v. Telsmith, Inc.*, 82 F.3d 394, 397 (Fed.Cir.1996) (citing *American Hoist and Derrick Co. v. Sowa and Sons, Inc.*, 725 F.2d 1350, 1362 (Fed.Cir.1984)).

 78. "Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information or submission of false material information, coupled with an intent to deceive." *Molins PLC*, 48 F.3d at 1178. Where the inequitable conduct alleged is the failure to disclose relevant prior art to the PTO, the defendant must prove by clear and convincing evidence that: (1) the prior art at issue is material; (2) the applicant had knowledge of the prior art; (3) the applicant knew of its materiality; and (4) the applicant failed to disclose the prior art with the intent to mislead the PTO. *See FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed.Cir.1987). Materiality and intent are threshold showings that must be proven by clear and convincing evidence. *See LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1070 (Fed.Cir.1992); *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1439 (Fed.Cir.1991).

■ 79. If the party with the burden of proof makes the threshold showing by clear and convincing evidence, then the court must balance materiality and intent "in light of all the circumstances to determine whether the applicant's conduct is *so culpable* that the patent should be held unenforceable." *Dayco Products, Inc. v. Total Containment, Inc.,* 329 F.3d 1358, 1363 (Fed.Cir.2003). The more material the omission, the less culpable the intent required, and vice versa. *See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1256 (Fed.Cir.1997).

■ 80. Under 37 C.F.R. § 1.56(b), "information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and (1)[i]t establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2)[i]t refutes, or is inconsistent with, a position the applicant takes in: (I)[o]pposing an argument of unpatentability relied on by the Office, or (ii)[a]sserting an argument of patentability." Courts have defined material to mean that there is "a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.,* 225 F.3d 1315, 1321 (Fed.Cir. 2000).

■ 81. "Intent is an independent element of inequitable conduct in patent prosecution, and must be separately established." *Hupp v. Siroflex of America, Inc.,* 122 F.3d 1456, 1465 (Fed.Cir.1997). Intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent. *See Braun Inc. v. Dynamics Corp. of America,* 975 F.2d, 815, 822 (Fed.Cir.1992). A finding of an intent to deceive cannot be based on mere inference or gross negligence. *See*

*Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867 (Fed.Cir. 1988). Intent may be found based on direct or circumstantial evidence. *See Critikon,* 120 F.3d at 1256 (Fed.Cir.1997). A finding of inequitable conduct renders the patent unenforceable. *See Kingsdown,* 863 F.2d at 877.

■ 82. For purposes of evaluating Mohawk's inequitable conduct claim, Higgins and Robertson are the only persons who were substantially involved in the prosecution of the Patents–In–Suit whom Mohawk alleges engaged in inequitable conduct.

83. TRC's unpatented single stabilizing layer carpet tile technology was material and not cumulative to information that was before the PTO. In addition, TRC developed a carpet tile with a single stabilizing layer prior to Higgins' development of the inventions claimed in the Patents–In–Suit. Higgins and Robertson had a duty to disclose material information to the PTO of which they had knowledge.

84. There is conflicting testimony regarding whether TRC informed Higgins of the structure of its single stabilizing layer carpet tile. The court must evaluate the credibility of the testimony presented given that TRC, Dow, Milliken, and Mohawk are interested parties in this litigation. TRC's representatives, including Wiegand and McDonald, testified that Higgins was told of TRC's carpet tile structure with a single stabilizing layer. Higgins denies he ever received any carpet tile samples or that he knew of TRC's carpet tile structure. The court finds that there is no clear and convincing evidence that Higgins' contacts with TRC show he had knowledge of TRC's secret carpet tile technology or that others at Milliken provided Higgins with this information. Higgins' visits to TRC were limited. During Higgins' only visit to TRC's manufacturing floor prior to the filing of the Parent Appli-

cation, Higgins viewed a tennis court material that was identical in structure to the single stabilizing layer carpet tile structure except for the athletic surface material and a range. Viewing the tennis court would not provide Higgins with information regarding the construction of TRC's single stabilizing layer carpet tile structure. Further, viewing the range, which was not in operation, would not show Higgins how to make a single stabilizing layer carpet tile. In addition, Higgins' second visit to TRC's manufacturing floor at the Dalton plant in 1995 was after he filed the Parent Application and concerned broadloom carpet, not carpet tile.

85. Mohawk has provided evidence of contacts by others at Milliken with TRC, such as Foody and Willimon. However, there is no clear and convincing evidence that Higgins obtained information from others at Milliken about TRC's carpet structure. Milliken's contacts with TRC generally concerned evaluating TRC as a potential supplier of cushion pads for the Comfort Plus product, and Milliken's contacts with TRC are consistent with this focus. Further, the range drawings and budget quotations for equipment do not show how to make TRC's single stabilizing layer carpet tile.

86. Robertson's failure to investigate TRC's technology after the April 1993 meeting does not show by clear and convincing evidence that he had the intent to deceive the PTO. Robertson requested a prior art search of patents that revealed a number of patents, including TRC patents, which shows Robertson's good faith. Higgins' explanation of the meaning of "similar art" in Robertson's April 1993 notes is credible because it was well-known in the carpet industry that TRC was laying carpet directly into polyurethane foam and two Tillotson patents disclosing this prior art of TRC were disclosed to the PTO in the Parent Application.

87. Although material, Higgins' failure to limit Claim 1 to "carpet tile" does not show by clear and convincing evidence the intent to deceive considering that prior art patents were provided to the PTO which disclosed the error. Higgins admits he did not invent the claims described in Claim 1 because it is not limited to carpet tile. However, Higgins testified that he uses the terms carpet and carpet tile interchangeably and the court finds his testimony credible. Further, Higgins volunteered to limit the claims to carpet tile after the PTO examiner indicated it would better define the claims. Therefore, considering all these factors, Mohawk has failed to establish by clear and convincing evidence that Higgins or Robertson intentionally deceived the PTO by failing to limit the claims to carpet tile.

88. Clearly, as reflected in the evidence and the finding of the jury, TRC first developed the structure covered by the Patents–In–Suit. Considering the totality of the evidence of the contacts between Milliken and TRC, there is a strong inference that Milliken knew of TRC's prior development of the single stabilizing layer carpet tile structure and failed to disclose it to the PTO. However, mindful of the standard of proof by clear and convincing evidence, the court is constrained to find that Mohawk has failed in its burden of proof. Based on the foregoing, the court finds that Mohawk has failed to prove inequitable conduct by clear and convincing evidence. Therefore, the Patents–In–Suit are not unenforceable.

Therefore, it is

**ORDERED** that Mohawk's claim for inequitable conduct is denied.

**IT IS SO ORDERED.**